Eleanor Pelton Danischefsky v. Commissioner.
Danischefsky v. Commissioner
Docket No. 19281.
United States Tax Court
1950 Tax Ct. Memo LEXIS 245; 9 T.C.M. (CCH) 254; T.C.M. (RIA) 50076; March 21, 1950
Everett D. McCurdy, Esq., Terminal Tower, Cleveland, Ohio, and W. D. Cole, Esq., for the petitioner. Cyrus A. Neuman, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency in income and victory tax for the year 1943 in the amount of $1,025.46. The Commissioner has added to the deficiency a 5 per cent penalty in the amount of $51.27, under section 291(a) of the Internal Revenue Code, for failure to file the income tax return within the time prescribed by law. The amount *246 of the penalty is 5 per cent of the amount of the deficiency. The income tax liability of the petitioner for the years 1942 and 1943 is involved in the computation of the deficiency because of the provisions of the Current Tax Payment Act. However, the issue which is presented to this Court for decision relates only to the year 1942, because the petitioner does not make any contention, now, that the Commissioner erred in any respect in his determinations relating to the amount of the income tax net income, and the victory tax net income of the petitioner for the year 1943. At the hearing, the petitioner abandoned all issues originally raised by the pleadings which related to the determination of the petitioner's income for 1943. The petitioner now concedes that the 5 per cent penalty properly was added to the deficiency under section 291(a) of the Code because the returns for 1942 and 1943 were filed later than was required by law, having abandoned, on brief, this issue which was raised in the petition. The only issues before the Court in this proceeding relate to payments made to petitioner in 1942 on behalf of her former husband under a property settlement agreement and an *247 assignment to her of part of his interest in a trust of which he is the sole beneficiary, and of part of his interest in certain funds which were to be paid to him to reimburse him for certain expenditures which he was entitled to recover. The first question is whether $2,760.67, paid to petitioner in 1942, was a partial repayment of a loan which she had made to her former husband. The second question is whether the petitioner understated the amount of certain trust income which was distributable to her in 1942. The petitioner concedes that section 171 of the Internal Revenue Code applies to part of the payments which the trustees made to her in 1942, namely, $6,015.68, which she reported in her income tax return for 1942 as taxable to her, and which was exclusive of another sum of $2,760.67 which she did not report in her return. Upon audit of the fiduciary return which was filed for the Clement D. Shaw Trust by the trustees for 1942, the Commissioner added to the net income of the trust $4,733.42, and $7,801.55, or a total amount of $12,534.97. These additions to income increased the net income of the trust to the total amount of $24,494.55. The Commissioner, *248 upon his understanding that the petitioner's share of the net income of the trust is an exact one-half, although that fact is disputed, also, determined that the petitioner is taxable upon $12,247.28 (one-half of the adjusted net income of the trust), rather than $6,015.68, which she reported in her return for 1942. The above determinations of the respondent have resulted in an increase of the gross income of the petitioner for 1942 in the amount of $6,231.60. The petitioner denies liability for income tax upon all the above amount. The petitioner filed her income tax returns for 1942 and 1943 with the collector for the district of Michigan. Findings of Fact During the years 1940 and 1941, and during part of 1942, the petitioner was married to Clement D. Shaw, who is referred to hereinafter as Shaw. She obtained a divorce from Shaw in May, 1942. In 1949, she re-married, and her married name became Danischefsky. Petitioner filed separate individual income tax returns for 1942 and 1943. Issue 1. Shaw is an engineer and inventor. Prior to 1940, Shaw was employed by Akron Standard Mold Company, but at some time in 1940 he left the employ of that Company. Thereafter he was *249 not employed but he devoted his time during part of 1940 and 1941 to the creation of a type of machine called a "plastic machine"; and while he was so engaged, he did not have any income of any kind, nor any savings which he could draw upon. During the above period, the petitioner owned securities which she had received as gifts from her father, $5,000 cash which was advanced to her from her mother's estate, and other cash which her father gave her. Petitioner loaned the $5,000 which she received from her mother's estate to Shaw for the purpose of building a plastic machine. Petitioner made additional loans to Shaw. The aggregate amount of the loans was $5,260. Shaw agreed, orally, to repay the loans in the above amount when his invention of a plastic machine produced income. When petitioner and Shaw contemplated proceedings for a divorce, in the early part of 1942, Shaw agreed to make a property settlement in petitioner's favor for the purpose of making a division of property, and provision for alimony and support and maintenance of petitioner and of their three minor children. Shaw and petitioner entered into a Property Settlement Agreement on May 7, 1942. Prior to the execution *250 of the agreement, petitioner discussed the matter of Shaw's indebtedness to her. Under the Property Settlement Agreement of May 7, 1942, Shaw agreed to, and did, execute, on May 7, 1942, an Assignment to petitioner of part of his interest in a trust of which he was the sole beneficiary, together with an assignment of other interests, as was set forth in the instrument of Assignment dated May 7, 1942. The trust of which Shaw was the sole beneficiary had been created by him on July 10, 1941, and it is described hereinafter. The two instruments - the Property Settlement Agreement and the Assignment - among other documents, were part of the decree of divorce which was granted to petitioner thereafter. The instrument of Assignment, dated May 7, 1942, was referred to in the Property Settlement Agreement of the same date. The Assignment contained separate provisions dealing with (a) income of the Clement D. Shaw Trust, and (b) receipts which Shaw would receive from certain business associates to reimburse him for expenditures Shaw had made in the development of a plastic machine. The provisions dealing with Shaw's assignment of part of his interest in the income of the trust (which *251 are set forth hereinafter under Issue 2) prescribed the method the trustees were to follow in determining the amount of the trust income which was to be paid to the petitioner; and, also, specifically excluded from the term "income" [of the trust] all of the receipts from the reimbursement payments to be made by Shaw's business associates. The pertinent provision of the trust provided, in part, as follows: "* * * As used herein the term "income" shall not include reimbursement to C. D. Shaw as set forth under Paragraph 11 of Exhibit 2 attached hereto as set forth in Exhibit B attached thereto, or consulting fees paid pursuant to Paragraph 8 of said Exhibit 2 attached hereto." Shaw's business associates had obligated themselves, under an agreement of July 2, 1941, to pay to him, out of their own funds, the total sum of $12,559.77, to reimburse him for certain expenditures which he had made, to which reference has been made, above. These expenditures included those made by Shaw with funds which petitioner loaned him, which aggregated $5,260. Shaw, in the Assignment to petitioner, distinguished his interest in the income of the trust and the interest in the trust income which he *252 assigned to petitioner from the payments he was entitled to receive as reimbursement; and the Assignment provided that in addition to (italics supplied) the payments to petitioner of part of the trust income, the trustees were to pay petitioner the total sum of $5,260 out of the "reimbursement" payments which they were to receive, at the rate of one-half of such receipts. During 1942, the trustees of the Clement D. Shaw Trust paid petitioner part of the trust income, and part of the "reimbursement" payments which they received from Shaw's business associates. The trustees, in their accounts, kept a memorandum account for the "reimbursement" payments apart from their account of trust income which was derived from royalties collected from users of Shaw's inventions. The trustees computed the share of petitioner in the trust income, in accordance with the directions given to them by Shaw in the Assignment of May 7, 1942, to be $6,015.68; and the share of petitioner in the "reimbursement" payments to be $2,760.67. The trustees paid both amounts to the petitioner during 1942. During 1942, the trustees received "reimbursement" payments of $4,733.43 from Shaw's business associates out of *253 which they paid $2,760.67 to petitioner. The petitioner, in her income tax return for 1942, reported as income only the amount of $6,015.68. She did not report her receipt of $2,760.67 because she understood that amount to be a payment in partial satisfaction of her loan of $5,260 to Shaw. The receipt of $2,760.67 was partial repayment to petitioner of her loan of $5,260 to Shaw. Issue 2. One asset of the Clement D. Shaw Trust in 1942 and 1943 was a management agreement Shaw had made on July 2, 1941, with certain business associates, who, in turn, had assigned their interests and obligations therein to a corporation called Plastics Processes, Inc. The management agreement provided, in general, that all of the business arrangements relating to the licensing of Shaw's inventions to others would be handled by Plastics Processes (successor to four persons named Pelton, Hoey, Wilson, and Granke). Plastics Processes was to collect all royalties and other income and apply it first to certain outstanding obligations which Shaw had incurred and then to its commissions for its services which were fixed at 75 per cent of the net receipts after making annual payments on the outstanding *254 obligations. Shaw was entitled to receive the balance of the net receipts, but payments went to him through the Clement D. Shaw Trust, of which Shaw was the only beneficiary under the trust indenture. When Shaw made assignment of part of his interest in the trust income, he provided that the trustees should take into account various debts of his own to others than petitioner and he directed that payments on his debts should not be a charge upon the share of the petitioner in the trust income which he gave to her under a separate assignment. The Assignment provided, in part, as follows.. "* * * that no indebtedness of the said Clement D. Shaw, except as hereinabove set forth, shall be paid out of the one-half interest in said trust assigned by this instrument to the said Eleanor Pelton Shaw." Under the Assignment it was first provided that Shaw assigned to Eleanor Pelton Shaw, (the petitioner) "the undivided one-half interest in and to all of his rights, benefits and property of every kind and nature * * *." Then, the Assignment directed the trustees of the Clement D. Shaw Trust to make payment of the income of the trust as follows, (the last sentence of the quoted provision relating *255 to the matters set forth under Issue 1, supra): "(e) That one-half of the entire income derived from said trust estate shall be paid by said Trustees in monthly installments, or oftener, to the said Eleanor Pelton Shaw, and the right of the Trustees to apply any of the income of or assets of said trust to any existing or future debts of the said Clement D. Shaw shall apply only to the one-half interest of the said Clement D. Shaw (except such payments as are or have been made, in accordance with Paragraph 10 of Exhibit 2 attached hereto, to creditors mentioned in Exhibit A thereto attached), meaning hereby that no indebtedness of the said Clement D. Shaw, except as hereinabove set forth, shall be paid out of the one-half interest in said trust assigned by this instrument to the said Eleanor Pelton Shaw. The one-half interest hereby assigned to the said Eleanor Pelton Shaw may be assigned by her inter vivos or disposed or [of] by Will. As used herein the term "income" shall not include reimbursement to C. D. Shaw as set forth under Paragraph 11 of Exhibit 2 attached hereto as set forth in Exhibit B attached thereto, or consulting fees paid pursuant to Paragraph 8 of said Exhibit *256 2 attached hereto." The trustees of the Clement D. Shaw Trust did not handle all of the receipts under the management agreement of Shaw and Plastics Processes, Inc. Plastics handled all collections and disbursements and kept the accounts relating thereto. Also, Plastics retained its commissions out of gross receipts. The trustees received a net amount from Plastics of the gross receipts which Plastics collected. Shaw, as an inventor, had several applications for Letters Patent on plastics molding methods and apparatus in 1941, prior to making the management agreement of July 2, 1941, with Pelton, Hoey, Wilson, and Granke. With respect to his rights in one of his inventions, there had been a dispute with his former employer, Akron Standard Mold Company, which had instituted proceedings against Shaw in a Federal District Court. That litigation had been terminated upon Shaw's execution of a settlement contract dated April 3, 1940, under which Shaw agreed to pay Akron Standard royalties in the total amount of $75,000, at the rate of not less than $1,200, and not more than $10,000 per year. Also, Shaw had become obligated to pay royalties to an associate, Kenneth Haefele, on account *257 of services rendered by Haefele. When Shaw entered into the managment agreement of July 2, 1941, he was obligated to make payments out of the income realized from certain of his inventions which were covered by the management agreement to Akron Standard Mold Company, to Haefele, and to others. In general, Shaw's obligations to others were for legal services by several law firms for their services in connection with litigation, and making applications for patents; the repayment of money which Shaw had borrowed, and for other expenses incurred but not paid. All of these obligations of Shaw were listed in Schedule A of the agreement. The management agreement was made subject to the settlement agreement with Akron Standard Mold Company, and an agreement with Haefele. Although the management agreement related to Shaw's various inventions, applications for patents, and license agreements previously made by Shaw, as enumerated in the management agreement, it did not convey Shaw's ownership in such property from him to the other parties to the management agreement. Thus is was provided that Shaw retained "the full ownership in and title in and to all of said 'inventions,' and the right *258 to grant licenses and execute royalty agreements or other contractual rights and interests relating to any of said 'inventions' * * *." The other parties to the management agreement were given the exclusive right in the United States to solicit and negotiate with prospective users, or licensees, to determine on the terms of licenses; to act as the sole representatives of Shaw; to furnish information and consulting engineering services; and, in general, to handle and manage all business relating to the "inventions." In doing the latter, they were to bill, collect, disburse, and handle all royalties, fees, moneys due, etc., and to keep accurate accounts. Shaw agreed to pay them compensation for their services, but in arriving at the sum to be paid them out of gross receipts, there shall be deducted from all collections the annual payments to be made upon Shaw's prior obligations referred to above, namely, the annual payments to Akron Standard, Haefele, and to others, all of which were set forth in Schedule A of the management agreement as "the obligations of Shaw." After allowing for annual payments on Shaw's obligations, the managers were to retain 75 per cent of the balance of gross *259 collections from royalties, etc., each year. Shaw was then to receive what was left out of collections. With respect to the commissions which the managers were to receive under the agreement, the matter of reimbursing Shaw his earlier expenditures was involved. In Schedule B of the agreement, there were listed items of $12,559.77 of expense which Shaw had paid, among which were those which he paid for with the loan of petitioner to Shaw of $5,260. (See Issue 1, supra). It was provided in the management agreement, paragraph 11, that the managers would reimburse Shaw out of their own funds (italics supplied), i.e., out of their 75 per cent commissions, for his prior expenditures, at the rate of 10 per cent of receipts under the agreement, and that such reimbursements were to be in addition to such amounts as became payable to Shaw under the management agreement, i.e., in addition to his share each year of the royalties, etc., which the managers collected. Under this provision the managers assumed certain prior expenses as their own and agreed to repay Shaw for them out of their commissions. In compliance with this part of the management agreement, Plastics Processes, Inc. paid from *260 its own funds during 1942, as reimbursement to Shaw, the total amount of $4,733.42, of which petitioner received $2,760.67, as set forth under Issue 1, supra. The receipt of $4,733.42 by the trustees was separate from its receipt of Shaw's share of the 1942 income under the management agreement. The item was handled by the trustees as an accommodation to both Shaw and Plastics Processes, Inc. During 1942, Plastics Processes, Inc., as the manager under the management agreement, made payments on Shaw's prior obligations to various parties as provided in Schedule A of the management agreement, in the aggregate amount of $7,801.55. Included therein was a payment of $2,332 to Akron Standard Mold; $2,509.33 to a law firm for legal services; $1,100 payment on a note of Shaw to C. S. Pelton; $92.20 to a patent lawyer; $1,009.14 to the firm of Richey & Watts; and $675.71 to repay a loan from W. B. Hoey to Shaw. The trustees of the Clement D. Shaw Trust did not receive any of the above sum of $7,801.55, and they did not make the disbursements of that amount. The disbursements were recorded in the accounts kept by Plastics Processes, Inc. The trustees, in making the fiduciary return *261 of the trust for 1942, reported as income from royalties under Shaw's management contract with Plastics Processes (which he had assigned to the trust) the total amount of $56,791.70. From this, the trustees deducted as expenses $31,994.33, the commission of Plastics Processes; $7,801.55, the payments by Plastics Processes on Shaw's obligations; and the $4,733.42 referred to above. After such deductions, the net income of the trust was reported to be $12,262.40. The trustees had $302.82 expenses for legal, bank and accounting services, which the respondent allowed as deductions. After these expenses the net cash of the trust for 1942 was $11,959.58, of which the trustees distributed $11,687.66, as follows: $5,671.98 to C. D. Shaw; and $6,015.68 to Eleanor Pelton Shaw, the petitioner. The Commissioner allowed the deduction of $31,994.33, as the commission of Plastics Processes, but he disallowed the deductions of $7,801.55 and $4,733.42. When Shaw created the Clement D. Shaw Trust on July 10, 1941, he conveyed to the trustees, in trust, property consisting of his pending applications for patents, license agreements made by Shaw, and the management agreement of July 2, 1941, and all *262 of his interest in the inventions covered by the applications for patents, subject, however, to the interests of Akron Standard Mold Company and Haefele. The trustees were empowered to grant licenses, subject to the terms of the management agreement, and to collect and receive all license and royalty fees due Shaw from any part of the trust estate. Also, the trustees were given authority to determine what should be treated as capital, what as income, and what as costs or expenses of the trust for all purposes connected with the trust. The trustees were directed to pay the entire net income of the trust, above expenses, to Shaw for life. In making assignment of part of his income in the trust to petitioner, his former wife, Shaw did not intend that trust income used to pay his obligations should be treated as part of his former wife's share of income. Shaw intended that she should receive part of the actual net income of the trust but only such part as the trustees could distribute to her. Under the assignment, petitioner was not an investor of capital in the trust. She was only a beneficiary of part of the net income which became payable to Shaw. Petitioner's share of the distributable *263 income of the trust for 1942 did not exceed the amount which the trustees distributed to her, namely, $6,015.68. Opinion There are two questions presented for decision: First, whether the part of the net income of the Clement D. Shaw Trust for 1942, which was distributable to the petitioner, exceeded $6,015.68, the amount which she reported in her income tax return. Second, whether an additional receipt of $2,760.67 was a repayment to petitioner of part of a loan she had made to Shaw. Petitioner did not report this item in her return. The evidence includes the various agreements which have been described in the findings of fact, the testimony of the petitioner, and the testimony of one of the trustees. Each question is a question of fact. Upon close examination of all of the evidence, certain facts have been found upon which both questions must be decided in petitioner's favor. Issue 1. Petitioner loaned Shaw $5,260 during the time they were married. Under the property settlement upon her divorce from Shaw, petitioner was entitled to one-half of the "income" of the trust. However, "income" was defined by the agreement, and, among other things, the term "income" was stated *264 to exclude the reimbursement payments due Shaw for expenses which he had incurred in developing his invention. Petitioner, therefore, was given no interest in the "reimbursement" payments as part of the distributable share of the income of the trust to which she was entitled. However, under the property settlement and accompanying assignment agreement, Shaw also agreed to repay to petitioner the $5,260 which she had loaned to him. He gave her the right to receive one-half of the "reimbursement" payments due him until such time as her receipts therefrom should total $5,260. Upon Shaw's direction, separate and apart from petitioner's share in the net income of the trust for 1942, therefore, the trustees paid out of a special fund, which they handled as a memorandum account, $2,760.67 to petitioner in partial satisfaction of the above debt of Shaw owing to petitioner. That which is received by a taxpayer in repayment of a loan she has made is not income to the taxpayer. Shaw is not before this Court. If he failed to report all of his income for 1942, whether he received it directly or constructively, his correct tax liability is not a question in this proceeding. However, reimbursement *265 to Shaw of $4,733.42 by Plastics Processes may not have represented income to him. If it did not represent income to Shaw, it would not constitute income of the trust. But the trust is not a petitioner in this proceeding either. It is held that the respondent erred in adding all or part of the sum of $2,760.67 to the taxable income of the petitioner. Under the above holding it is unnecessary for us to say anything further about the item of $4,733.42. But in the interests of clarity the following observation is made: The Commissioner agrees that the trust is entitled to deduct the commission of Plastics Processes, Inc. The trustees deducted, and the Commissioner allowed, $31,994.33 as commissions. If the trustees understated the amount of the commission by the sum of $4,733.42, then the error is one of form and not of substance. There is in evidence a summary of the account of Plastics Processes, Inc. for receipts and disbursements in 1942 under the management agreement. From this agreement, as well as the management contract, it appears that the amount of the commission of Plastics Processes included both the $31,994.33 deducted as commission by the trustees and the $4,733.42 deducted *266 as reimbursement payments by the trustees. It may have been a mistake for the trustees to have noted $4,733.42 as a separate item rather than reporting Plastics' commission as $36,727.75. Plastics was to take out of gross receipts only the Schedule A payments on certain obligations of Shaw, before computing its 75 per cent commission. Then, it was to take its commission, and make reimbursement payments (Schedule B payments) out of its own funds, i.e., the commission. However, we do not decide this question because the trust is not before us, and the pleadings do not present the question. Issue 2. The second question is whether petitioner's share of the net income of the trust in 1942 exceeded $6,015.68, which was distributed to her. The trust reported the gross receipts collected by Plastics Processes in 1942 under the management agreement. Plastics paid $7,801.55 upon the Schedule A obligation of Shaw, as it was required to do. Part of the above payments represented royalties due Akron and Haefele. The trust deducted the above amount in computing the net receipts for 1942 under the management agreement. Dissallowance of the deduction accounts for part of respondent's increase *267 in petitioner's share of the net income of the trust. It is clear from the Assignment agreement that Shaw intended that the net distributable income of the trust should be computed after allowing for application of part of annual collections to the payment of Schedule A obligations which were his obligations. That is to say, that petitioner's share of the trust income was not to include any amount which was paid in discharge of Schedule A obligations. In computing petitioner's share of the net distributable income, the trustees followed Shaw's directions. It is concluded that the respondent erred in adding to petitioner's share of the trust income any part of the sums used by Plastics to pay part of the Schedule A obligations. Respondent, on brief, has not made any contentions or argument about the second question in this proceeding. We assume, therefore, that he has abandoned this question, and no longer contends that petitioner's share of the trust income for 1942 exceeded $6,015.68. The respondent's determinations for the year 1942 are reversed. There is no deficiency in tax due from petitioner with respect to the year 1942. The petitioner concedes that a small increase *268 in her 1943 income was properly made by the respondent. Since the forgiveness of tax aspect of the Current Tax Payment Act requires the computation of one tax for 1942 and 1943, and the petitioner made a small error in reporting her 1943 income, recomputation under Rule 50 seems to be necessary. If the recomputation results in some deficiency, an addition thereto of 5 per cent is properly made as the penalty for the late filing of the returns under section 291(a) of the Code. Decision will be entered under Rule 50.